Benjamin Heikali (SBN 307466)
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
E-mail:   bheikali@faruqilaw.com

[Additional Captions on Signature Page]

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH RICE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GENOMIC HEALTH, INC., KIMBERLY J. POPOVITS, JULIAN C. BAKER, GINGER L. GRAHAM, DR. HENRY J. FUCHS, DR. FELIX J. BAKER, GEOFFREY M. PARKER, and DR. FRED E. COHN,<br><br>Defendants. | Case No. 3:19-cv-05929<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Joseph Rice ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Genomic Health, Inc. ("Genomic" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Genomic, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Genomic and Exact Sciences Corporation ("Exact Sciences").

2.      On July 28, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive (a) $27.50 in cash, without interest, plus (b) a fraction of a share of Exact Sciences common stock equal to the quotient obtained by dividing $44.50 by the average of the volume-weighted average prices per share of Exact Sciences common stock on The Nasdaq Stock Market on each of the 15 consecutive trading days ending immediately prior to the closing of the merger, for each share of Genomic stock they own (the "Merger Consideration").  If the Exact Sciences stock price is equal to or less than $98.79 or equal to or greater than $120.75, a two-way collar mechanism will apply, pursuant to which (i) if the Exact Sciences stock price is equal to or greater than $120.75, the exchange ratio will be fixed at 0.36854 and (ii) if the Exact Sciences stock price is equal to or less than $98.79, the exchange ratio will be fixed at 0.45043.  Upon completion of the merger, Genomic shareholders will own approximately 8.7% to 10.4% and Exact Science shareholders will own approximately 89.6% to 91.3% of the combined company.

3.      On August 30, 2019, in order to convince Genomic shareholders to vote in favor

- 1 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement (the "S-4") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading S-4 violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.

4.    While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.    In particular, the S-4 contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Genomic shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Genomic's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.    It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.    For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Genomic shareholders sufficiently in

- 2 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Genomic maintains its principal executive offices in this District.

## PARTIES

11.      Plaintiff is, and at all relevant times has been, a holder of Genomic common stock.

12.      Defendant Genomic is incorporated in Delaware and maintains its principal executive offices at 301 Penobscot Drive, Redwood City, California 94063.  The Company's common stock trades on the NASDAQ under the ticker symbol "GHDX."

13.      Individual Defendant Kimberly J. Popovits is Genomic's President, Chief Executive Officer and Chairman and has been a director of Genomic since March 2002.

14.      Individual Defendant Julian C. Baker is Genomic's lead director and has been a director of Genomic since January 2001.

15.      Individual Defendant Ginger L. Graham has been a director of Genomic since December 2008.

- 3 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

16.     Individual Defendant Dr. Henry J. Fuchs has been a director of Genomic since September 2013.

17.     Individual Defendant Dr. Felix J. Baker has been a director of Genomic since January 2012.

18.     Individual Defendant Geoffrey M. Parker has been a director of Genomic since June 2016.

19.     Individual Defendant Dr. Fred E. Cohen has been a director of Genomic since April 2002.

20.     The Individual Defendants referred to in paragraphs 13-19 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Genomic (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of August 26, 2019, there were approximately 40,000,000 shares of Genomic common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of Genomic will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation

- 4 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1

**SUBSTANTIVE ALLEGATIONS**

2

**I.      The Proposed Transaction**

3          23.     Genomic is a global provider of genomic based diagnostic tests that address both

4    the overtreatment and optimal treatment of early and late stage cancer.  The Company uses its

5    Oncotype IQ Genomic Intelligence Platform to translate clinical and genomic data into clinically

6    actionable results for treatment planning throughout the cancer patient's journey, from diagnosis

7    to treatment selection and monitoring.  The Oncotype IQ Genomic Intelligence Platform is

8    currently comprised of the Company's line of Oncotype DX gene expression tests for breast,

9    prostate and colon cancers, as well as the Company's expanded platform of a liquid-based test,

10   Oncotype DX AR-V7 Nucleus Detect test for advanced stage prostate cancer.

11         24.     On July 29, 2019, Genomic and Exact Sciences issued a joint press release

12   announcing the Proposed Transaction, which states in pertinent part:

13
14         MADISON, Wis. and REDWOOD CITY, Calif., July 29, 2019 /PRNewswire/ -
           - Exact Sciences Corp. (NASDAQ: EXAS) and Genomic Health, Inc.
15         (NASDAQ: GHDX) today announced that the companies have entered into a
           definitive agreement under which Exact Sciences will combine with Genomic
16         Health for $72.00 per share in a cash and stock transaction valued at $2.8 billion.
           The transaction, which has been unanimously approved by the Boards of
17         Directors of both companies, is expected to be completed by the end of 2019.

18         Together, Exact Sciences and Genomic Health will create a leading global cancer
           diagnostics company. The combined company will offer two of the strongest and
19         fastest growing brands in cancer diagnostics, Cologuard and Oncotype DX,
           providing a robust platform for continued growth. With this enhanced platform,
20         including a commercial presence in more than 90 countries, the combined
           company expects to continue to increase adoption of current tests, and to bring
21         new innovative cancer diagnostics to patients throughout the world.

22
           On a pro forma basis, the combined company expects to generate revenue of
23         approximately $1.6 billion and gross profit of approximately $1.2 billion in 2020.
           Additionally, the combination is expected to generate annualized cost synergies of
24         approximately $25 million within the third full year following close, primarily
           through reducing public company costs and purchasing optimization.
25

26         "Uniting the best minds and molecular diagnostics capabilities will advance the
           fight against cancer. Combining industry pioneers Exact Sciences and Genomic

27                                              - 6 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
28                     **THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

Health is a pivotal step toward building the leading cancer diagnostics company in the world," said Kevin Conroy, chairman and CEO of Exact Sciences. "Exact Sciences is continuing to grow sales and expand adoption of Cologuard at a rapid pace, and Genomic Health's Oncotype DX is the global standard of care to inform treatment decisions for women with breast cancer. Together, with our collective resources and broader platform, we will be able to provide our existing tests to more people, while also accelerating the development and launch of future cancer diagnostic tests. We are excited to join together two teams who are united in their dedication to making a positive impact on patients' lives."

"We are very pleased to join forces with Exact Sciences, a company and team with which we have a shared vision to revolutionize the way cancer is diagnosed and treated," said Kim Popovits, chairman of the board, chief executive officer and president of Genomic Health. "Genomic Health has achieved incredible success over nearly two decades in pioneering cancer diagnostics, and the recent landmark TAILORx trial results set a new standard of care for the use of the Oncotype DX test for women with early-stage invasive breast cancer. This transaction provides immediate value to Genomic Health stockholders through an upfront cash payment, as well as ownership in a combined company with enhanced financial strength and the commercial and R&D capabilities to continue to drive significant growth into the future."

**Combining Talented Teams with Proven Capabilities to Create a Leading Cancer Diagnostics Company**

- **Joins two of the strongest brands in cancer diagnostics into one entity and provides platform for continued growth:** Cologuard and Oncotype DX, the companies' leading brands, will respectively continue to help detect colorectal cancer and inform treatment decisions in colorectal, breast and prostate cancer, which collectively represent approximately 40% of all solid tumor incidence.

  - Exact Sciences' **Cologuard** has a total available U.S. screening market of $15 billion, with an additional potential $3 billion opportunity among people ages 45-49[1]. To date, Cologuard has captured less than 6% of the large addressable market of people over 50 years old, and is rapidly building on its 174,000 health care provider customer base, with a goal of reaching 40% share of the market over the long-term. In the second quarter of 2019, Cologuard revenue grew 94% year-over-year.

  - Genomic Health's **Oncotype** IQ portfolio has guided personalized treatment decisions for more than one million cancer patients worldwide, and delivered more than 19% year-over-year overall revenue growth in the second quarter of 2019. Genomic Health estimates that its Oncotype DX suite of products in oncology and urology have a total available market of $2 billion.

- 7 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

- **Forms best-in-class commercial, R&D and clinical organization, with enhanced scale and scope in cancer diagnostics:** The transaction will create a combined R&D team with extensive clinical capabilities and a robust evidence generation engine, complemented by proven regulatory expertise, and key relationships with oncologists. The combined commercial organization will have more than 1,000 team members inclusive of sales, marketing and reimbursement teams. The combined company will have the financial strength to support a high level of investment in R&D. This will support the development of innovative products across the diagnostic paradigm, including the ongoing work to identify proprietary biomarkers across the world's 15 deadliest cancers, while continuing to advance the adoption of current products.

- **Provides global infrastructure to accelerate the ability to provide new innovative cancer diagnostics to patients:** The combined company will have a commercial presence in more than 90 countries and expanded reach across primary care, oncology, OB/GYN, gastroenterology, and urology to support growth of existing and future cancer tests. The combined company will build upon Genomic Health's presence in the San Francisco Bay Area, providing lab infrastructure in a state where the Medicare Administrative Contractor participates in the MolDx program, which may facilitate reimbursement of future liquid biopsy products.

**Transaction Terms**

Under the terms of the agreement, for each share of Genomic Health common stock they own, Genomic Health stockholders will receive $27.50 in cash and $44.50 in shares of Exact Sciences stock, subject to a 10% collar centered on Exact Sciences' volume-weighted average price for the 45 trading days ended July 26, 2019.

Based on the parties' closing stock prices as of July 26, 2019, the last trading day prior to today's announcement, the total per-share consideration represents a premium of approximately 19% to Genomic Health's volume-weighted average price ("VWAP") for the last 30 trading days. Upon closing, Exact Sciences shareholders are expected to own approximately 91% of the combined company, and Genomic Health stockholders are expected to own approximately 9%.

**Transaction Approvals**

The transaction is subject to customary closing conditions and regulatory approvals, including the approval of stockholders of Genomic Health. Felix and Julian Baker and certain funds advised by entities with whom they are affiliated, which collectively own approximately 25.3% of the outstanding shares of Genomic Health common stock, have entered into agreements to vote in favor of the transaction.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

**Advisors**

Centerview Partners and XMS Capital Partners are serving as financial advisors to Exact Sciences and Skadden, Arps, Slate, Meagher & Flom LLP is serving as legal advisor. Goldman Sachs & Co. LLC is serving as financial advisor to Genomic Health and Sullivan & Cromwell LLP and Pillsbury Winthrop Shaw Pittman LLP are serving as legal advisors.

**Conference Call Information and Transaction Website**

Associated presentation materials and an infographic regarding the transaction will be available on the investor relations section of each company's website at http://investor.exactsciences.com/investor-relations/default.aspx and https://investor.genomichealth.com as well as a joint transaction website at www.leadingcancerdiagnostics.com.
The two companies will host a joint conference call today at 8:00 a.m. ET to discuss this transaction. The call will include a slide presentation and participants are encouraged to view the presentation via webcast at https://event.on24.com/wcc/r/2018181/407D8C8CC89693670C3884786F1E4F 14.

| Date: | Monday, July 29, 2019 |
|---|---|
| Time: | 8 a.m. ET, 7 a.m. CT, 5 a.m. PT |
| Webcast: | The live webcast can be accessed at www.exactsciences.com and www.genomichealth.com |
| | Domestic callers, dial 877-201-0168 |
| | International callers, dial +1 647-788-4901 |
| | Access code for both domestic and international callers: 8288326 |

An archive of the webcast will be available at www.exactsciences.com. A replay of the conference call will be available by calling 800-585-8367 domestically or 416-621-4642 internationally. The access code for the replay is 8288326. The webcast, conference call and replay are open to all interested parties.

**Exact Sciences and Genomic Health Second Quarter 2019 Earnings Results**

In separate news releases, Exact Sciences and Genomic Health today both announced their financial results for the second quarter of 2019, ended June 30, 2019. Exact Sciences and Genomic Health will address any questions regarding their earnings on the joint transaction call at 8 a.m. ET. Exact Sciences and Genomic Health have cancelled their previously scheduled earnings calls on July

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

30, 2019, and August 1, 2019, respectively.

**About Exact Sciences Corp.**

Exact Sciences Corp. is a molecular diagnostics company focused on the early detection and prevention of some of the deadliest forms of cancer. The company has exclusive intellectual property protecting its non-invasive, molecular screening technology for the detection of colorectal cancer. For more information, please visit the company's website at www.exactsciences.com, follow Exact Sciences on Twitter @ExactSciences or find Exact Sciences on Facebook.

**About Genomic Health**

Genomic Health, Inc. (NASDAQ: GHDX) is the world's leading provider of genomic-based diagnostic tests that help optimize cancer care, including addressing the overtreatment of the disease, one of the greatest issues in healthcare today. With its Oncotype IQ® Genomic Intelligence Platform, the company is applying its world-class scientific and commercial expertise and infrastructure to lead the translation of clinical and genomic big data into actionable results for treatment planning throughout the cancer patient journey, from diagnosis to treatment selection and monitoring. The Oncotype IQ portfolio of genomic tests and services currently consists of the company's flagship line of Oncotype DX® gene expression tests that have been used to guide treatment decisions for over 1 million cancer patients worldwide. Genomic Health is expanding its test portfolio to include additional liquid- and tissue-based tests, including the Oncotype DX® AR-V7 Nucleus Detect™ test. The company is based in Redwood City, California, with international headquarters in Geneva, Switzerland. For more information, please visit, www.GenomicHealth.com and follow the company on Twitter: @GenomicHealth, Facebook, YouTube and LinkedIn.

25.     Genomic is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

26.     If the false and/or misleading S-4 is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e., the difference between the value to be received as a result of the Proposed

- 10 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

**II.    The Materially Incomplete and Misleading S-4**

27.    On August 30, 2019, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction. The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*The Materiality of Financial Projections*

28.    A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the S-4 discloses "[i]n connection with a possible transaction, Genomic Health's management provided certain non-public, unaudited prospective financial information regarding Genomic Health's anticipated results of operations and prospective synergies from the combination of Genomic Health and Exact Sciences for fiscal years 2019 through 2026 to the Genomic Health Board and Genomic Health's financial advisor, Goldman Sachs." S-4 70.  The Company's management also created projections for financial information regarding Exact Sciences' pro forma combined company for fiscal years 2019 through 2026, taking into account projected synergies, that were given to the Board and Goldman Sachs.  *Id.*

29.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose

- 11 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

"financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

30.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

31.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

(i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

32.    Here, Genomic's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, one of the Board's

- 12 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

stated reason for recommending the merger is "Genomic Health's strategic plan and related financial projections and the risks and uncertainties in executing on the strategic plan and achieving such financial projections . . . ." S-4 57.

33.    As discussed further below, the non-GAAP financial projections here do not provide Genomic's shareholders with a materially complete understanding of the assumptions and key factors considered in developing financial projections, which assumptions, factors and other inputs the Board reviewed.

### *The Financial Projections Relied on by the Board*

34.    The S-4 discloses that "[i]n connection with a possible transaction, Genomic Health's management provided certain non-public, unaudited prospective financial information regarding Genomic Health's anticipated results of operations and prospective synergies from the combination of Genomic Health and Exact Sciences for fiscal years 2019 through 2026 to the Genomic Health Board and Genomic Health's financial advisor, Goldman Sachs." *Id.* at 70. The Company's management also created projections for financial information regarding Exact Sciences' pro forma combined company for fiscal years 2019 through 2026, taking into account projected synergies, that were given the Board and Goldman Sachs. *Id.*

35.    The S-4 further discloses that the assumptions used in the financial projections were "prepared in good faith and based on information available at the time of preparation . . . ." *Id.* at 72.

36.    The S-4 goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2026 for: (1) EBITDA; (2) EBIT; and (3) unlevered free cash flow, but fails to provide (i) the line items used to calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 71-72.

37.    The S-4 does not define EBITDA, but notes that it is presented after the impact of stock based compensation. *Id.* at 71 n. 2.  Nevertheless, the S-4 fails to reconcile EBITDA to its

- 13 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

most comparable GAAP measure nor disclose the line items used to calculate EBITDA, rendering the S-4 materially false and/or misleading. *Id.* at 71.

38.     The S-4 does not define EBIT, but notes that it is presented after the impact of stock based compensation. *Id.* at 71 n.2.  Nevertheless, the S-4 fails to reconcile EBIT to its most comparable GAAP measure nor disclose the line items used to calculate EBIT, rendering the S-4 materially false and/or misleading. *Id.* at 71.

39.     The S-4 does not define unlevered free cash flow in any way and fails to reconcile UFCF to its most comparable GAAP measure or disclose the line items used to calculate UFCF, rendering the S-4 materially false and/or misleading. *Id.*

40.     Thus, the S-4's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

41.     The financial projections disclosed on pages 71-72 of the S-4 violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G, as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading, as shareholders are unable to discern the veracity of the financial projections.

42.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

- 14 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1    ***The Financial Projections Violate Regulation G***

2    43.    The SEC has acknowledged that potential "misleading inferences" are

3    exacerbated when the disclosed information contains non-GAAP financial measures[1] and

4    adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-

5    GAAP financial measures."[3]

6    44.    Defendants must comply with Regulation G.  More specifically, the company

7    must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by

8    schedule or other clearly understandable method) of the differences between the non-GAAP

9    financial measure disclosed or released with the most comparable financial measure or measures

10   calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the

11   SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP

12   financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result

13   in a more accurate pricing of securities."[4]

14   45.    Moreover, the SEC has publicly stated that the use of non-GAAP financial

15   measures can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the

16   frequent use by publicly traded companies of unique company-specific non-GAAP financial

17

18   [1]    Non-GAAP financial measures are numerical measures of future financial performance
     that exclude amounts or are adjusted to effectively exclude amounts that are included in the most
19   directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

20   [2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of
     Regulation G.

21   [3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003),
22   *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

23   [4]    SEC, *Final Rule.*

24   [5]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's
     Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation
25   (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-
     measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies
26   Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at*
     http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-
27   into-profits.html?_r=0.

- 15 -

28   **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
     THE SECURITIES EXCHANGE ACT OF 1934**

1  measures (as Genomic included in the S-4 here) implicates the centerpiece of the SEC's

2  disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the
> GAAP information, has become the key message to investors, crowding out and
> effectively supplanting the GAAP presentation. Jim Schnurr, our Chief
> Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation
> Finance and I, along with other members of the staff, have spoken out frequently
> about our concerns to raise the awareness of boards, management and investors.
> And last month, the staff issued guidance addressing a number of troublesome
> practices *which can make non-GAAP disclosures misleading*: the lack of equal or
> greater prominence for GAAP measures; exclusion of normal, recurring cash
> operating expenses; individually tailored non-GAAP revenues; lack of
> consistency; cherry-picking; and the use of cash per share data.  I strongly urge
> companies to carefully consider this guidance and revisit their approach to non-
> GAAP disclosures.  I also urge again, as I did last December, that appropriate
> controls be considered and that audit committees carefully oversee their
> company's use of non-GAAP measures and disclosures.[6]

46.    The SEC has required compliance with Regulation G, including reconciliation

requirements, in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Letter to SEC 5

(Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP

financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff

Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial

information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-

A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Letter

---

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110 465916089133/filename1.htm.

[8]    *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/ filename1.pdf.

- 16 -

to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

47.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the S-4 into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

**_The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9_**

48.     In addition to the S-4's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading, as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Company's financial prospects with similarly situated companies.

49.     Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading for the reasons discussed above.  Indeed, Defendants acknowledge that "there are limitations associated with the use of non-GAAP financial measures. Non-GAAP financial

---

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corp.*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Cannot Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflects the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml.

- 17 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1  measures are not prepared in accordance with GAAP, are not reported by all of Genomic

2  Health's competitors and may not be directly comparable to similarly titled measures of

3  Genomic Health's competitors or other companies due to potential differences in the exact

4  method of calculation. Non-GAAP financial measures should not be considered in isolation

5  from, or as a substitute for, financial information presented in accordance with GAAP." S-4 71.

6      50.    Moreover, the S-4 fails to even define any of the non-GAAP measures. This is

7  problematic because non-GAAP terms do not have standardized definitions and a company can

8  choose to define the metrics in any way they choose.  As a reconciliation and the line items were

9  not provided for the non-GAAP metrics, it is unclear how the Company has actually defined

10 them and whether or not non-traditional adjustments were made.

11     51.    Additionally, the S-4 fails to provide any of the standalone Exact Sciences

12 financial projections prepared by the Company's management.  This information is necessary for

13 shareholders, separate from the pro-forma combined company, as a significant portion of the

14 Merger Consideration is Exact Sciences stock.  Genomic shareholders are being asked to give up

15 their Company stock in exchange for Exact Sciences stock.  In order for a shareholder to

16 determine the attractiveness of the Merger Consideration, they need to be able to assign a value

17 to the Exact Sciences shares.  The value shareholders place on the Exact Science shares will

18 directly influence how they value the Merger Consideration.

19     52.    The value of the Exact Sciences shares is material information separate from the

20 value of the pro-forma combined company shares because shareholders cannot determine if the

21 exchange ratio fairly values the Company without knowing the projected stand-alone projections

22 of Exact Sciences.  The pro-forma combined company projections might show that Company

23 shareholders are expected to receive a benefit, but in order to determine if they are receiving

24 their fair share of the benefit, the Company must disclose the management generated Exact

25 Sciences projections.

26     53.    As such, financial projections are plainly material, and shareholders would clearly

27                                 - 18 -

28 **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

1    want a complete and non-misleading understanding of those projections.

2        54.    In order to cure the materially misleading nature of the projections under SEC

3    Rule 14a-9 as a result of the omitted information on pages 71-72, Defendants must provide a

4    reconciliation table of the non-GAAP financial measures to the most comparable GAAP

5    measures.

6        ***The Materially Misleading Financial Analyses***

7        55.    The summary of the valuation methodologies utilized by Goldman Sachs

8    including the utilization of certain of the non-GAAP financial projections described above by

9    Goldman Sachs, in connection with its valuation analyses, (*id.* at 62) is misleading in violation of

10   Regulation 14a-9.  The opacity concerning the Company's internal projections renders the

11   valuation analyses described below materially incomplete and misleading, particularly as

12   companies formulate non-GAAP metrics differently.  Once a S-4 discloses internal projections

13   relied upon by the Board, those projections must be complete and accurate.

14       56.    Goldman Sachs's fairness opinion fails to do any valuation analyses on Exact

15   Sciences as a stand-alone company.  As Exact Sciences stock makes up a large portion of the

16   Merger Consideration, shareholders need to know the value of the consideration they are

17   receiving in order to properly compare what they are giving up (i.e. their ownership interests in

18   the Company as a stand-alone entity). Without this information, shareholders are unable to

19   adequately determine if the Merger Consideration fairly compensates them for their Company

20   shares.

21       57.    With respect to Goldman Sachs's *Illustrative Present Value of Future Share Price*

22   *Analysis – Genomic Health Standalone*, the S-4 fails disclose the inputs that went into the

23   calculation of the Company's cost of equity, the net cash and the number of fully diluted shares.

24   *Id.* at 65

25       58.    With respect to Goldman Sachs's *Illustrative Pro Forma Present Value of Future*

26   *Share Price Analysis – Value to Genomic Health Stockholders*, the S-4 fails disclose the inputs

27                                              - 19 -

that went into the calculation of the pro forma combined company's cost of equity, the net cash and the number of fully diluted shares. *Id.* at 65-66.

59.    With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis – Genomic Health Standalone*, the S-4 states that Goldman Sachs discounted to present value as of June 30, 2019 estimates of unlevered free cash flow for Genomic Health for the years 2019 through 2026 as reflected in the management forecasts and a range of illustrative terminal values for Genomic Health, which were calculated by applying perpetuity growth rates, ranging from 2.0% to 4.0%, to a terminal year estimate of the free cash flow to be generated by Genomic Health, as reflected in the management forecasts. *Id.* at 66. Goldman Sachs used a discount rate ranging from 9% to 10% reflecting the estimate of the Company's weighted average cost of capital. *Id.* Goldman Sachs then added the Company's net cash and divided by the number of fully diluted outstanding shares to derive a range of illustrative equity values. *Id.* at 66-67.

60.    The S-4 does not disclose the values Goldman Sachs calculated for the range of terminal values, any of the inputs that went into calculating the Company's weighted average cost of capital, the inputs and assumptions that went into selecting the perpetuity growth rates, nor the number of fully diluted shares outstanding.

61.    With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis – Pro Forma Value Per Share to Genomic Health Stockholders*, the S-4 states that Goldman Sachs discounted to present value as of June 30, 2019 estimates of unlevered free cash flow for the pro forma combined company in the years 2019 through 2026 as reflected in the management forecasts and a range of illustrative terminal values for the pro forma combined company, which were calculated by applying perpetuity growth rates, ranging from 3.0% to 5.0%, to a terminal year estimate of the free cash flow to be generated by the pro forma combined company (including synergies), as reflected in the management forecasts. *Id.* at 67. Goldman Sachs used a discount rate ranging from 8.5% to 9.5% reflecting the estimate of the pro forma combined company's weighted average cost of capital. *Id.* Goldman Sachs then added the combined

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

company's pro forma net debt and divided by the pro forma number of fully diluted outstanding shares to derive a range of illustrative equity values. *Id.*

62.    The S-4 does not disclose the values Goldman Sachs calculated for the range of terminal values, any of the inputs that went into calculating the pro forma combined company's weighted average cost of capital, the inputs and assumptions that went into selecting the perpetuity growth rates, the pro forma net debt nor the pro forma number of fully diluted shares outstanding.

63.    Since information was omitted, shareholders are unable to discern the veracity of Goldman Sachs's discounted cash flow analyses.  Without further disclosure, shareholders are unable to compare Goldman Sachs's calculations with the Company's financial projections.  The absence of any single piece of the above information renders Goldman Sachs's discounted cash flow analyses incomplete and misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

64.    As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (Aug. 2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ." *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

65.    The failure to disclose the inputs for the Company's cost of equity and weighted average cost of capital and the pro forma combined company's cost of equity and weighted average cost of capital is particularly misleading because of the values Goldman Sachs selected. For the Company's cost of equity and weighted average cost of capital, Goldman Sachs selected 9.4% and a range of 9% to 10% respectively.  S-4 65-66.  For the pro forma combined company's cost of equity and weighted average cost of capital, Goldman Sachs selected 9.1% and a range of 8.5% to 9.5% respectively.  *Id.* at 66-67.

66.    For both the Company and the pro forma combined company, the cost of equity is toward the low end of the weighted average cost of capital range.  This is problematic because a company's weighted average cost of capital should be lower than its cost of equity as the cost of debt (a factor in the calculation of the weighted average cost of capital) is lower than its cost of equity.  Therefore, unless a company is 100% equity financed (where the weighted average cost of capital would be equal to the cost of equity), the weighted average cost of capital should be lower than the cost of equity.  Goldman Sachs's selected weighted average cost of capital ranges suggest that there are scenarios where the Company's and the pro forma combined company's cost of debt is larger than the cost of equity.  As the discount rate is one of the most important factors in any valuation analysis, shareholders need to know how Goldman Sachs has calculated the discount rates for the respective analyses and why the weighted average cost of capital range for both the Company and the pro forma combined company contains discount rates higher than the cost of equity, as this would be a very uncommon scenario that shareholders would need to know about.

67.    Therefore, in order for Genomic shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

68.    In sum, the S-4 independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Sections 14(a) and 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Transaction from Genomic shareholders.

69.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

70.     Further, failure to remedy the deficient S-4 and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e., the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I
### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)

71.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [S-4] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

- 23 -

73.    As set forth above, the S-4 omits information required by SEC Regulation G, 17

C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other

things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation

of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other

clearly understandable method" of the non-GAAP measure to the "most directly comparable"

GAAP measure.  17 C.F.R. § 244.100(a).

74.    The failure to reconcile the non-GAAP financial measures included in the S-4

violates Regulation G and constitutes a violation of Section 14(a).

75.    As a direct and proximate result of the dissemination of the false and/or

misleading S-4 Defendants used to recommend that shareholders approve the Proposed

Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e., the

difference between the value they will receive as a result of the Proposed Transaction and the

true value of their shares prior to the merger) in an amount to be determined at trial and are

entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

**<u>COUNT II</u>**
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**
**Promulgated Thereunder)**

76.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

77.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration

statements that contain "any statement which, at the time and in the light of the circumstances

under which it is made, is false or misleading with respect to any material fact, or which omits to

state any material fact necessary in order to make the statements therein not false or

misleading[.]"  17 C.F.R. § 240.14a-9(a).

78.    Regulation G similarly prohibits the solicitation of shareholder votes by

"mak[ing] public a non-GAAP financial measure that, taken together with the information

accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a*

- 24 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

*material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading.*" 17 C.F.R. § 244.100(b) (emphasis added).

79.    Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

80.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4 but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

81.    The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

82.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

83.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately

- 25 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

84.    Genomic is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

85.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

86.    As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e., the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III
### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

87.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

88.    The Individual Defendants acted as controlling persons of Genomic within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Genomic, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

- 26 -

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

89.    Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the S-4.

91.    In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

92.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

93.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

1  certifying Plaintiff as Class Representative and his counsel as Class Counsel;

2        B.     Enjoining Defendants and all persons acting in concert with them from

3  proceeding with the shareholder vote on the Proposed Transaction or consummating the

4  Proposed Transaction, unless and until the Company discloses the material information discussed

5  above which has been omitted from the S-4;

6        C.     Directing Defendants to account to Plaintiff and the Class for all damages

7  sustained as a result of their wrongdoing and to award damages arising from proceeding with the

8  Proposed Transaction;

9        D.     Awarding Plaintiff the costs and disbursements of this action, including

10 reasonable attorneys' and expert fees and expenses; and

11       E.     Granting such other and further relief as this Court may deem just and proper.

12 **JURY DEMAND**

13     Plaintiff demands a trial by jury on all issues so triable.

14 Dated:  September 23, 2019

15                               Respectfully submitted,

16                               **FARUQI & FARUQI, LLP**

17 **OF COUNSEL:**                By: _/s/ Benjamin Heikali_
                              Benjamin Heikali, Bar No. 307466

18 **FARUQI & FARUQI, LLP**      10866 Wilshire Blvd., Suite 1470
                              Los Angeles, CA 90024

19 Nadeem Faruqi                Tel.: (424) 256-2884
    James M. Wilson, Jr.          Fax: (424) 256-2885

20 685 Third Ave., 26th Fl.       Email: bheikali@faruqilaw.com

21 New York, NY 10017
    Telephone: (212) 983-9330

22 Email: nfaruqi@faruqilaw.com    _Counsel for Plaintiff_
    Email: jwilson@faruqilaw.com

23 _Counsel for Plaintiff_

24

25

26

27 - 28 -

28 **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Case No. 3:19-cv-05929

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Joseph Rice ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Genomic Health, Inc. ("Genomic Health") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Genomic Health's securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 18th day of September, 2019.

_Joseph Rice_
Joseph Rice

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 06/05/18 | 150 |
|  |  |  |
|  |  |  |